IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JANICE OVERMAN on behalf of        )
JOHNNY LEE OVERMAN, deceased,      )
                                   )
                Plaintiff,         )
                                   )
        v.                         )    Case No.
                                   )    07-0130-CV-W-REL-SSA
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
                Defendant.         )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Janice Overman, on behalf of Johnny Overman,
deceased, seeks review of the final decision of the Commissioner
of Social Security denying plaintiff's application for disability
benefits under Title II of the Social Security Act ("the Act").
Plaintiff argues that the ALJ erred in ignoring the opinions of
treating medical sources Leon Probasco, a social worker, and Dr.
Thomas Vinton, and that the ALJ erred in failing to analyze the
credibility of the third parties.  I find that the substantial
evidence in the record as a whole supports the ALJ's finding that
plaintiff was not disabled prior to August 1, 2003.  Therefore,
plaintiff's motion for summary judgment will be denied and the
decision of the Commissioner will be affirmed.

*I.    BACKGROUND*

On September 29, 2003, plaintiff applied for disability
benefits alleging that he had been disabled since January 20,

2003.[1]  Plaintiff's disability stems from mental and liver
problems.  Plaintiff's application was granted with an onset date
of August 1, 2003.  Dissatisfied with the onset date, plaintiff
requested a hearing before an administrative law judge.  On March
27, 2005, plaintiff died, and his wife was substituted as
plaintiff.  On August 1, 2005, a hearing was held before an
Administrative Law Judge.  On August 23, 2005, the ALJ found that
plaintiff was not under a "disability" from January 20, 2003,
through August 1, 2003.  On January 18, 2007, the Appeals Council
denied plaintiff's request for review.  Therefore, the decision
of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by

---

[1]With respect to plaintiff's alleged onset date, the ALJ's
order states as follows:  "The claim was granted initially with
an onset of disability of August 1, 2003, which was claimant's
alleged onset as initially set forth in his application.
However, in its allowance, the Social Security Administration
stated, "You said that you became unable to work 4/15/03, because
of mental and liver problems. . .  [The] medical evidence needed
to evaluate your condition did not show your condition was severe
enough to meet your our [sic] requirements until 8/1/03."
Dissatisfied with this determination, claimant filed a request
for hearing with an Administrative Law Judge, asking for an even
earlier onset date of January 20, 2003." (Tr. at 20).

2

substantial evidence.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 850-51 (8th Cir. 2000); <u>Johnson v. Chater</u>, 108 F.3d 178, 179 (8th Cir. 1997); <u>Andler v. Chater</u>, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because

substantial evidence would have supported an opposite decision."
<u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

4

```
                    Yes = not disabled.
                    No = go to next step.
```

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

```
                    No = not disabled.
                    Yes = go to next step.
```

3. Does the impairment meet or equal a listed impairment in Appendix 1?

```
                    Yes = disabled.
                    No = go to next step.
```

4. Does the impairment prevent the claimant from doing past relevant work?

```
                    No = not disabled.
                    Yes =  go to next step where burden shifts to Com-
missioner.
```

5. Does the impairment prevent the claimant from doing any other work?

```
                    Yes = disabled.
                    No = not disabled.
```

## IV. THE RECORD

The record consists of the testimony of plaintiff's wife; medical expert Selbert Chernoff, M.D.; and vocational expert Amy Silva, in addition to documentary evidence admitted at the hearing. Additionally, several relatives completed third-party statements.

5

## A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports[2]:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1963 through 2005:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1963 | $    171.88 | 1985 | $42,162.54 |
| 1964 | 725.20 | 1986 | 36,082.73 |
| 1965 | 488.42 | 1987 | 43,800.00 |
| 1966 | 1,221.91 | 1988 | 45,000.00 |
| 1967 | 2,923.49 | 1989 | 48,000.00 |
| 1968 | 4,543.91 | 1990 | 51,300.00 |
| 1969 | 7,800.00 | 1991 | 53,400.00 |
| 1970 | 7,800.00 | 1992 | 55,500.00 |
| 1971 | 7,800.00 | 1993 | 57,600.00 |
| 1972 | 9,000.00 | 1994 | 62,996.68 |
| 1973 | 11,698.96 | 1995 | 61,200.00 |
| 1974 | 13,039.27 | 1996 | 59,084.09 |
| 1975 | 14,100.00 | 1997 | 48,515.51 |
| 1976 | 15,300.00 | 1998 | 50,624.22 |
| 1977 | 16,500.00 | 1999 | 53,571.01 |
| 1978 | 17,700.00 | 2000 | 57,009.66 |
| 1979 | 22,900.00 | 2001 | 42,773.34 |

---

[2]All of the administrative reports were completed by plaintiff's wife due to plaintiff's trouble writing and difficulty "recalling details of recent happenings." (Tr. at 159).

6

| 1980 | 25,900.00 | 2002 | 53,389.25 |
|------|-----------|------|-----------|
| 1981 | 29,700.00 | 2003 | 0.00 |
| 1982 | 32,400.00 | 2004 | 0.00 |
| 1983 | 35,700.00 | 2005 | 0.00 |
| 1984 | 37,800.00 | | |

(Tr. at 117-127).

**Disability Report - Adult**

On September 17, 2003, plaintiff's wife completed a Disability Report - Adult for plaintiff (Tr. at 129-138). Plaintiff listed his condition as ascites[3], depression, alcoholic cirrhosis[4], and anxiety disorder. When asked when the condition first bothered him, plaintiff reported January 20, 2001. When asked when he was first unable to work due to his condition, plaintiff reported April 1, 2003.

Plaintiff reported that he stopped working on January 20, 2003, because "Jays Snack Foods pulled out of the Kansas City Market. This company is based in Chicago."

---

[3]Abnormal accumulation of fluid in the abdomen.

[4]Cirrhosis is a complication of many liver diseases that is characterized by abnormal structure and function of the liver. The diseases that lead to cirrhosis do so because they injure and kill liver cells, and the inflammation and repair that is associated with the dying liver cells causes scar tissue to form. The liver cells that do not die multiply in an attempt to replace the cells that have died. This results in clusters of newly-formed liver cells within the scar tissue.

7

**Work Activity Report**

In a Work Activity Report dated September 17, 2003, plaintiff reported that he stopped working "because they pulled out of the KCMO market in 01-2003. I was not paid for a lot (over $10,000.00) of work I had done. I continued to work (for no pay) for the company until I started drawing unemployment in 03/2003. I continued to draw unemployment thru the first part of 09-2003. I was hospitalized on 08-31-2003 for Ascites/Cirrhosis/depression and stayed in the hospital for 6 days." (Tr. at 139-142).

**Claimant Questionnaire**

In an undated Claimant Questionnaire (it was date stamped October 22, 2003, but not dated by plaintiff), plaintiff reported that he could not pay bills, use a checkbook, complete a money order or count change because he could not write well and he would shake when handling small items (Tr. at 155-159). He could watch an hour-long television show, but he could not watch a two-hour movie because he had to get up to "cough/vomit". He was able to drive short distances to his son's home (about two miles away) twice a week. When asked if anyone had advised him not to drive, he checked "yes" and noted it was his wife and family due to plaintiff's getting lost.

8

**Claimant Questionnaire**

In a Claimant Questionnaire dated January 5, 2004, plaintiff noted that he could watch a one-hour television show but could not watch a two-hour movie due to trouble sitting up that long and going to sleep (Tr. at 176). Plaintiff noted that he had gotten much worse since his gall bladder surgery and 21-day hospital stay.

**Function Report**

In a Function Report completed by plaintiff's wife on January 27, 2004, Mrs. Overman reported that plaintiff "no longer drinks" (Tr. at 195).

**Disability Report Appeal**

In a Disability Report Appeal dated March 30, 2004, Mrs. Overman attached a supplement which reads in part as follows:

> Johnny has now been granted medical disability from social security with a beginning date of August 2003. We are very grateful for this assistance, but feel the need to apply for additional back payment to the beginning of his major health difficulties. Last March and April 2003, Johnny was in a very depressed state over job difficulties and health situations and tried to commit suicide on two different occasions. Johnny last worked approximately on January 20, 2003. He has a history of depression/anxiety since 2001, and Dr. Vinton has treated him with medication for this. We would like the committee to reconsider his beginning date due to these major life events back to January 20, 2003 when he last worked.

(Tr. at 203).

**B.    *SUMMARY OF MEDICAL RECORDS***

On May 9, 2002, plaintiff saw Thomas Vinton, M.D. (Tr. at 278). "He comes in with his wife today and she asks whether it is a problem taking Paxil and drinking alcohol at the same time. He does admit to drinking five or six mixed drinks in the afternoon. He does admit to some sadness, poor motivation, and irritability." Dr. Vinton referred to plaintiff's blood work done in August 2001 which showed mildly elevated liver function tests with AST[5] at 91 and ALT[6] at 62. Dr. Vinton assessed generalized anxiety disorder and depression, improved on Paxil [antidepressant], memory loss possibly due to alprazolam [for anxiety] use or to alcohol, and excessive alcohol intake. He switched plaintiff's Paxil to Effexor [antidepressant] and advised him to never take alprazolam and alcohol at the same time. "I again emphasized the importance of reducing his alcohol intake to two drinks [or] less daily. Better yet would be total abstinence." Dr. Vinton told plaintiff to come back the next day for a hepatic function panel, complete blood count, chemistry profile, and lipid profile.

---

[5]AST is found in the liver and other organs. High AST levels in the bloodstream can be a sign of liver trouble, but AST levels cannot be used to forecast disease progression or specifically measure liver damage.

[6]ALT is found in the liver only. High levels of ALT in the bloodstream indicates possible liver inflammation and/or damage. An ALT test cannot predict liver damage or disease progression.

10

On August 17, 2002, plaintiff saw Steve Nelson, M.D., in Dr. Vinton's office (Tr. at 276-277). Plaintiff complained of anxiety and reported several panic attacks. "Patient continues to drink excessively sometimes 8 to 10 beers a day. He denies having a problem. He states his wife has worked on him to try to [get] him to just stop." Plaintiff's gait was normal. Dr. Nelson assessed anxiety, alcohol use, and memory loss "probably secondary to alcohol use." Dr. Nelson discussed with plaintiff the "importance of alcohol cessation and total abstinence. Recommend the patient attend AA meetings. Patient refused this at this time." Dr. Nelson prescribed Celexa [antidepressant] and recommended behavioral psychotherapy.

On September 25, 2002, plaintiff saw Dr. Vinton due to recent chest pain (Tr. at 276). Plaintiff reported that he awoke three days earlier with mid chest pain or pressure. "He did have three or four 'stiff drinks' the evening prior to this episode." Plaintiff had continued to take Celexa and felt "as if it has helped his moods, and overall he feels calmer than he did prior to beginning the medication." Plaintiff's social history was "significant for a history of intermittent excessive alcohol use. He has restricted his alcohol intake to an average of two or

11

three beers nightly." Dr. Vinton recommended plaintiff have a stress test to rule out angina pectoris[7].

On September 30, 2002, plaintiff's wife called Dr. Vinton's office and said that plaintiff went to meetings in Wichita and became very ill, vomiting all day then he passed out. Paramedics were called, an EKG was done. Plaintiff was unable to say what day it was or where he was at. He refused to go to the hospital. "Plaintiff had stopped drinking bourbon on 9/26."

On October 3, 2002, plaintiff called Dr. Vinton's office and said he was going out of town and did not know when he would be able to schedule a stress test (Tr. at 275).

Plaintiff was a patient at Liberty Hospital from December 3, 2002, until his discharge on December 4, 2002 (Tr. at 357-358, 365-367, 369-371). He was treated by Dr. Vinton. Plaintiff was seen in the emergency room for nausea and vomiting, and he was admitted with a diagnosis of gastroenteritis[8] versus gastritis[9].

---

[7]Chest pain due to coronary artery disease.

[8]Inflammation of the stomach and small and large intestines. It is sometimes called the stomach flu, although it is not caused by a flu virus.

[9]Gastritis is a term used to describe a group of conditions characterized by inflammation of the lining of the stomach. Commonly, the inflammation of gastritis results from infection with the same bacterium that causes most stomach ulcers. Yet other factors — including traumatic injury and regular use of certain pain relievers — also can contribute to gastritis. In spite of the many conditions associated with gastritis, the signs and symptoms of the disease are very similar: a burning pain in

12

Plaintiff reported having several mixed drinks on the afternoon prior to developing the vomiting. He reported a history of excessive alcohol consumption and admitted that his current alcohol intake was either a six-pack of beer or a half a pint of whiskey daily. Dr. Vinton noted that plaintiff had "frequent problems with anxiety and is taking Celexa for anxiety. It has controlled those symptoms quite well." He wrote that plaintiff did not want to be in the hospital and was in denial about the fact that he drinks too much alcohol.

On exam there was no palpable liver or spleen enlargement and there was no ascities[10] or edema[11]. His lab work showed ALT at 69, AST at 108, alkaline phosphatase[12] at 157. Total[13] and

---

the upper abdomen and, occasionally, bloating, belching, nausea or vomiting.

[10]Abnormal accumulation of fluid in the abdomen.

[11]An accumulation of an excessive amount of watery fluid in cells or intercellular tissues.

[12]Alkaline phosphatase (ALP) is an enzyme found in the bones, intestines, kidneys and placenta as well as the liver. Abnormally high ALP can have many causes other than liver damage including bone disease, congestive heart failure, and hyperthyroidism. A rise in ALP levels can indicate liver trouble if GGT levels are also elevated.

[13]Bilirubin is a yellow fluid produced in the liver when worn-out red blood cells are broken down. Bilirubin can leak out from the liver into the bloodstream if the liver is damaged. The causes of abnormal bilirubin levels include viral hepatitis, blocked bile ducts, liver scarring (cirrhosis), and other liver diseases. Normal bilirubin levels vary from a high of 1.0 to 1.5.

direct[14] bilirubin were "slightly elevated." Dr. Vinton noted that plaintiff's liver enzymes were moderately improved the next day.

Dr. Terry Coleman saw plaintiff in consultation and assessed acute alcoholic gastritis; alcohol liver disease; and history of blackout spells, rule out alcohol-induced seizures. Plaintiff had told Dr. Coleman that he was drinking six or seven mixed drinks per day.

Dr. Vinton discharged plaintiff. "On dismissal, a long discussion ensued with him and his wife. He was told [in] no uncertain terms that he must stop drinking alcohol. He stated his willingness to do so, but wanted to try on his own. He was concerned about job security and if it were known that he had an alcohol problem."

---

[14]Bilirubin metabolism begins with the breakdown of red blood cells. Red blood cells contain hemoglobin, which is broken down to heme and globin. Heme is converted to bilirubin, which is then carried by albumin in the blood to the liver. In the liver, most of the bilirubin is chemically attached to another molecule before it is released in the bile. This "conjugated" (attached) bilirubin is called direct bilirubin; unconjugated bilirubin is called indirect bilirubin. Total serum bilirubin equals direct bilirubin plus indirect bilirubin. Conjugated bilirubin is released into the bile by the liver and stored in the gallbladder, or transferred directly to the small intestines. If the bile ducts are blocked, direct bilirubin will build up, escape from the liver, and end up in the blood. Increased direct bilirubin may indicate obstructed biliary (liver secretion) ducts, cirrhosis, hepatitis, or other conditions.

14

On December 9, 2002, plaintiff saw Dr. Vinton for a follow up (Tr. at 274-275). Dr. Vinton noted that plaintiff had been hospitalized the previous week with nausea and vomiting. "In the hospital, he was found to be hypokalemic[15] with a potassium 3.8. His AST and ALT were elevated at 100 and 169, respectively. . . . Mr. Overman admitted to having been drinking about one-half pint of whiskey daily. He has had a history of excessive alcohol use in the past. He has remained gainfully employed, and does not think that it has affected his work performance. He was advised to go to alcoholic rehab, but he did not feel as if he could because he thought that it might result in him losing his job. He was also advised to attend Alcoholics Anonymous, but he has not done so yet. . . . He has not drink [sic] alcohol since dismissal from the hospital. He denies nausea, vomiting, diarrhea, melena, or hematochezia."

Dr. Vinton examined plaintiff and noted that neither his liver nor his spleen were enlarged. He assessed asymptomatic gastritis, well-controlled hypertension, alcohol liver disease,

---

[15]Hypokalemia is a condition of below normal levels of potassium in the blood serum. Potassium, a necessary electrolyte, facilitates nerve impulse conduction and the contraction of skeletal and smooth muscles, including the heart. It also facilitates cell membrane function and proper enzyme activity. Levels must be kept in a proper (homeostatic) balance for the maintenance of health. The normal concentration of potassium in the serum is in the range of 3.5-5.0 mM. Hypokalemia means serum or plasma levels of potassium ions that fall below 3.5 mM.

and hypokalemia.  Dr. Vinton recommended plaintiff have a complete blood count to reassess the platelet count and to check plaintiff's electrolytes to reassess his potassium level.  "I again advised him to attend Alcoholics Anonymous.  I explained . . . the high incidence of relapse into use of alcohol without some sort of a program like Alcoholics Anonymous."

January 20, 2003, is plaintiff's amended alleged onset date of disability.

On March 28, 2003, plaintiff saw Dr. Vinton for alcohol abuse, follow up of gastroesaphogeal reflux disease, gastritis, and depression (Tr. at 272, 274).

> Several days ago while he was despondent he cut his arm a number of times with a knife.  He is brought in today by his wife and son.  His son came here from Austin, TX for this. They are insisting he go into the hospital for treatment of his alcoholism.  He, as expected, is resisting, although he does admit he has an alcohol problem.  He has had some persistent elevation of liver enzymes, although not severely high.  He most recently has been drinking about 1/2 to 3/4 of a pint of hard liquor daily. . . .  He was previously diagnosed by me as having depression and has been taking Celexa 40 mg daily.  Despite this he has anhedonia, sadness, and other depressive symptoms.

Dr. Vinton performed an exam and found that plaintiff's liver and spleen were not enlarged, there was no ascites, no edema or varicosities [varicose veins] in his extremities.

> IMPRESSION:
> 1.    Alcoholism.
> 2.    Depression, secondary to alcoholism.
> 3.    Hypertension, well controlled.

16

4.    Gastritis.
       5.    Hypercholesterolemia.

       PLAN:
       I agreed with his wife and son that he should be admitted to
       an alcohol rehab unit.  I advised them to go to NKC Hospital
       where he could be admitted to the Tri-County alcohol rehab
       program.

       Plaintiff was a patient at Shawnee Mission Medical Center

from March 28, 2003, until March 30, 2003, where he was treated

by E. Michael Young, M.D. (Tr. at 227-241).  Plaintiff reported

that he had a history of alcoholism and his last alcoholic drink

was Wednesday, or two days earlier.  Plaintiff reported nausea

and vomiting for a couple days prior to admission, but while at

the hospital those symptoms ceased and his appetite returned.

Plaintiff reported drinking a fifth of bourbon per day for the

past six months.  He said he was unemployed, that his company

recently shut down and eliminated his position.  Plaintiff

reported that he attends church services regularly.

       On exam, his gait was normal.  All other testing was normal.

His mood, affect, speech, orientation, memory, thought processes,

and thought content were all normal.  Plaintiff's blood work on

March 28, 2008, showed a low platelet count[16] of 83 with 150-450

_____

       [16]Platelets are cells that form the primary mechanism in
blood clots.  They are also the smallest of blood cells.
Individuals with liver disease develop a large spleen.  As this
process occurs platelets are trapped within the sinusoids (small
pathways within the spleen).  While the trapping of platelets is
a normal function for the spleen, in liver disease it becomes
exaggerated because of the enlarged spleen.  Subsequently, the

                                  17

being normal; a slightly high Alkaline Phosphatase count of 124 (with 40-120 being normal); a high AST count of 106 with 1-35 being normal; and a high bilirubin count of 2.0 with normal being 0-1.0.  Plaintiff's ALT was normal.

Plaintiff participated in individual therapy on March 31, 2003.  "Met with patient as he was leaving the unit.  Staff had said patient was being discharged from program.  Patient said he had told psychiatrist he didn't think he needed to return for further treatment.  RN said she heard in report Dr. Barask said patient had refused to stay in ARU [alcohol rehabilitation unit].  CM called patient's wife and reported above.  She said she had outpatient appointment with Dr. Young set up for 4-14-03 and would set up outpatient treatment."

That same day plaintiff participated in group therapy.  "He thinks just staying busy will keep him sober.  He appears to be in denial of what it will take to stay sober."  The notes state that plaintiff admitted "he had been drinking too much, making his depression worse."

The discharge summary reads in part as follows:

CHIEF COMPLAINT:  Alcohol dependence.

HISTORY OF PRESENT ILLNESS:  . . .  The patient, when I spoke with him states that he has been having an increasing problem with alcohol over the past one year.  He relates that a lot of this is due to the fact that he has had job

_____

platelet count may become diminished.

18

stressors where he had to release a number of people where he worked at, due to the fact that the company he has worked at is not doing well financially. He states "having to do this has really weighed on my conscience." He had also described symptomology related to problems with depression and anxiety. He states a number of these issues primarily are related to the fact that he has had distress at his job and he states "because I was constantly thinking and worrying about what happened with this situation at work and what I have done it was always on my mind and I was always thinking about it." He states "the alcoholism just seemed to spiral out of control." He states that recently while he was drinking he became upset and cut on himself and he states "I do not even really remember doing it, it never would have happened had I not been drunk." He does give a history of withdrawal symptoms coming off of alcohol where he was recently detoxified in the fall of 2002, but did not follow up with any substance treatment services. At the time of my evaluation he did describe depression and he described his mood as "2-3 out of 10." He denied suicidal or homicidal ideation. . . .

PAST PSYCHIATRIC HISTORY: Significant for history of alcohol dependence where he was treated for withdrawal symptoms in the fall of 2002. . . .

MENTAL STATUS EXAMINATION: The patient was pleasant, polite, cooperative, well-groomed with good eye contact. Speech was regular rate and rhythm and goal-directed. His mood was "2 out of 10." His affect was restricted. He denied suicidal or homicidal ideation. He denied any cravings. His memory seemed grossly intact. His insight and judgment were fair.

HOSPITAL COURSE: . . . The patient was detoxified. At the time of discharge his vital signs were stable. He showed no tremors. He showed no ataxia and denied any nausea, vomiting or diarrhea. He denied any cravings. Furthermore, he described his mood as "much better" and his affect was bright, calm and euthymic. He described his mood as "an 8 out of 10" of the date of discharge. He adamantly denied suicidal or homicidal ideation and denied any cravings. He seemed motivated for treatment. He noted excellent support from his family and denied any alcohol usage within the household. He notes that alcohol had been removed at this time. The patient was requesting discharge. The patient was discharged at this time, but am strongly encouraging

19

that he come back for the partial day program for further substance treatment and he is agreeable to this at this time. . . .

DISCHARGE DIAGNOSIS:
Axis I:     Alcohol dependence.
            Alcohol withdrawal.
            Major depressive disorder, recurrent, severe, without psychotic symptoms.
                    * * * * *
Axis V:     Global Assessment of Function[17] at the time of admission was 30 and at the time of discharge was between 50 to 60.

DISCHARGE INSTRUCTION: Patient was discharged to home. Activity is as tolerated. Diet is regular. He is to follow up with the partial day program starting on March 31, 2003. He was strongly encouraged to avoid any alcohol or drug abuse.

DISCHARGE PSYCHIATRIC MEDICATIONS: Lexapro 20 mg daily.

On April 13, 2003, plaintiff presented to the emergency room

at Liberty Hospital where his blood alcohol level was 328 (normal

is less than 10) (Tr. at 350). About two hours and 45 minutes

later, his blood alcohol level was 273 (Tr. at 353). Just over

an hour and a half later, it was down to 230 (Tr. at 354). By

_____

[17]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).
        A GAF of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).
        A GAF of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

20

six hours after his arrival, it was down to 191 (Tr. at 355).

From April 13, 2003, until April 14, 2003, plaintiff was a patient at Two Rivers Psychiatric Hospital (Tr. at 249-254). Plaintiff was treated by Dr. Young, the same doctor who treated him at Shawnee Mission Medical Center. The report reads in part as follows:

> HOSPITAL COURSE: . . . By speaking with the patient, his primary issues continue to be related, primarily due to the fact that he continues to use alcohol even after he was discharged from Shawnee Mission. He did not follow up with the outpatient services that I recommended at Shawnee Mission Medical Center. He noted that he was doing fine and states, "The medication really works as long as I don't drink." He noted that he had relapsed drinking a fifth of alcohol, which led to his erratic behavior in trying to cut his wrist. On the date of discharge, he described his mood as "really good" and his affect was bright, calm, and euthymic. He denied suicidal or homicidal ideation. He was eating and sleeping well. I spoke with the patient at length and I also spoke with the patient's wife at length via the telephone, regarding the fact that the patient was requesting to be discharged at this time and I felt the patient was stable to be discharged and there was no way to hold him involuntarily but I did feel that he needed further treatment regarding evaluation of his mood, as well as symptoms regarding his alcohol issues. I stated that I felt it was imperative that the patient follow up with the day program regarding his alcohol issues. . . . [T]he patient agreed to try to go on Antabuse 250 mg daily. I gave him psychoeducation regarding the Antabuse. He was also given information on Antabuse by the unit and they understood the fact that he could not drink with the Antabuse as he would have a reaction with this medication if he did. He understood this and was agreeable to take the Antabuse and was started with this Antabuse on an outpatient basis. . . .

21

```
FINAL DIAGNOSIS:
Axis I    Alcohol dependence
          Alcohol withdrawal
          Major depressive disorder, recurrent, severe,
          without psychotic symptoms.
                        * * * * *
Axis V    At the time of discharge [his GAF] was between 50
          and 60. [At the time of admission it was 30].
```

DISCHARGE INSTRUCTIONS:  . . .  He was strongly encouraged to avoid alcohol and understood the fact that if he drank alcohol, he would have a reaction to the Antabuse.

* * * * *

DISCHARGE MEDICATIONS:  Antabuse 250 mg daily, Lexapro 20 mg daily.

On July 23, 2003, plaintiff saw Susan Kimble, an advanced practice registered nurse, in Dr. Vinton's office with a complaint of vomiting (Tr. at 271). "He reported two alcoholic drinks last night. He denies currently drinking on a daily basis. He reports a previous episode of some nausea and vomiting which needed some Phenergan to help him stop the vomiting." Plaintiff was given 25 mg of Phenergan intramuscularly.

Plaintiff was found to be disabled as of August 1, 2003.

Plaintiff was a patient at Liberty Hospital from August 31, 2003, until his discharge on September 6, 2003, where he was treated by Lancer Gates, D.O. (Tr. at 280-287). Plaintiff reported long-standing history of alcohol use and said he had been laid off three months earlier. "He became very depressed and began drinking large quantities of alcohol. He drank a fifth

22

of Seagram's VO per day. Dr. Vinton saw the patient and
discontinued his use of Lipitor because of the concurrent alcohol
use. The patient began to notice that his abdomen had become
firmer three weeks ago. Then three to four days ago the patient
drank a large quantity of liquor. He then developed nausea and
vomiting three days ago with diarrhea. He has not had anything
to drink in the past three days. He presented to the Emergency
Room because of abdominal pain and nausea and vomiting."
Plaintiff was assessed with alcoholic hepatitis, alcoholism, and
depression.

On September 1, 2003, Thomas Jones, M.D., evaluated
plaintiff while he was hospitalized. Dr. Jones noted that
plaintiff "has been consuming massive quantities of alcohol over
the last several months and now approximately a fifth of whiskey
per day. He had been depressed and sitting around home. He
evidently has been noted to have increased liver enzymes in the
recent past and Lipitor was discontinued." Dr. Jones assessed
(1) nausea and vomiting; (2) question ascites; (3) elevated liver
function tests, possible alcoholic hepatitis versus chronic
hepatitis of unknown cause versus common bile duct stone; (4)
decreased platelets, increased coagulation, possible alcohol
related bone marrow toxicity versus cirrhosis; and (5) diarrhea.

23

The following day a sonogram was done of plaintiff's abdomen, and Christine Keesling, M.D., observed a slightly enlarged spleen and echogenic liver consistent with fatty infiltration (Tr. at 297).

Dr. Gates's discharge summary reads in part as follows:

HISTORY/HOSPITAL COURSE:  This is a 56-year-old male who presented with nausea and vomiting.  He was found to have a large amount of ascites.  He had a paracentesis[18] on September 2.  He did well.  He was given Librium for alcohol withdrawal and became very sedated.  His Librium was decreased and then discontinued.  His sedation began to lift He was seen on numerous occasions by Social Services but failed to commit to alcohol rehab. . . .

CONDITION ON DISCHARGE:  . . .  Psych:  Pleasant affect, less fatigued.

LABORATORY AND X-RAY DATA:  On 9/4 white blood count was 11,300, hemoglobin and hematocrit 13.3 and 38.5, platelet count 122,000 and MCV 100.  The electrolytes on the day of discharge showed sodium of 131, potassium 4.0, chloride 96, $CO_2$ 26, AST 84, alk phos 204, direct bilirubin 4.2, total bilirubin 5.4, white count 18,000, hemoglobin and hematocrit 12.0 and 35.0, platelet count 134,000.  These were all improved from the hospital stay. . . .There was a slightly enlarged spleen and echogenic liver consistent with fatty infiltration. . . .

DISCHARGE PLANS:
1.   The patient is to see Dr. Vinton on Monday to check a
     basic metabolic panel and liver function tests. . . .

(Tr. at 280-281).

_____

[18]Paracentesis is a procedure to take out fluid that has collected in the belly (peritoneal fluid). This fluid buildup is called ascites. Ascites may be caused by infection, inflammation, an injury, or other conditions, such as cirrhosis or cancer. The fluid is taken out using a long, thin needle put through the belly.

24

On September 8, 2003,[19] plaintiff saw Dr. Vinton, 48 hours after he had been discharged from the hospital (Tr. at 269). Dr. Vinton detected some ascitic fluid. He diagnosed cirrhosis with ascites, lethargy possibly due to elevated ammonia[20] level, and alcoholism. "It was emphasized that he absolutely must quit drinking or he will be dead within weeks to months. If he stops drinking, there is a chance he may have some recovery."

On September 16, 2003, plaintiff saw Dr. Vinton for back pain and a follow up of cirrhosis and high blood pressure (Tr. at 268). "He fell last evening and began complaining of back pain. He had been drinking yesterday, and had a blood alcohol level of 71. He had apparently not drank for about 5 days after I last saw him, but began drinking again on September 13th." Dr. Vinton noted that plaintiff's ER lab work showed an ammonia level of 48, "which was better than the level of 95 on September 8." He assessed a back contusion, cirrhosis, alcoholic hepatitis, and

---

[19]The record says "cont. 9-8-03"; however, I have been unable to find any other page with records from September 8, 2003.

[20]Analysis of blood ammonia aids in the diagnosis of severe liver diseases and helps to monitor the course of these diseases. Ammonia levels are helpful in the diagnosis and treatment of hepatic encephalopathy, a serious brain condition caused by the accumulated toxins that result from liver disease and liver failure. The medical record by Dr. Vinton includes a handwritten notation that the increased ammonia was secondary to liver malfunction and was causing plaintiff's drowsiness.

25

past history of hypertension now hypotensive. "He was advised again that if he drinks again, he may die quickly."

In an addendum, Sheila Alton, M.D., noted that plaintiff was "in here just recently with alcohol hepatitis. . . . His liver function tests were slightly elevated with an AST of 101 and ALT of 71, however he did drink today so I'm sure that increased his level to 71. Currently ammonia is 48, which is stable." Plaintiff wanted something for the pain, so he was given an injection of Demerol. "I did not feel comfortable giving him a pain prescription as he obviously was continuing to drink . . . He is having pain in the back area and it is very difficult to see, but once again in someone who continues to drink and with alcoholic hepatitis, our hands are rather tied. All this was explained to the patient and he was encouraged to get help with his alcoholism."

On October 17, 2003, plaintiff saw Dr. Vinton for a follow up. "He says that he has 'not been drinking much', but is somewhat vague about exactly how much he has drank since he was last [here]. He did have one vomiting episode last evening, probably caused by the drinking from the night before." Dr. Vinton did not detect any ascitic fluid. He assessed cirrhosis, clinically doing better; right upper quadrant pain, etiology not clear; and history of hypertension, apparently stable. He

26

ordered a complete blood count, liver function panel, electrolytes, BUN, creatinine, and ammonia levels. "I encouraged him to quit drinking altogether."

On October 28, 2003, plaintiff saw Charles Beggs, M.D., for right upper quadrant pain and right back pain (Tr. at 453). "He has been treated on numerous occasions for alcoholic hepatitis/ cirrhosis. He apparently continues to drink." Dr. Beggs assessed chronic cholecystitis [inflammation of the gallbladder] with cholelithiasis [gallstones]. "It is somewhat difficult to separate symptoms related to his alcohol abuse and cirrhosis however some of his symptoms are typical of biliary colic[21]. He also assessed chronic alcohol abuse with associated cirrhosis. Dr. Beggs recommended a laproscopic removal of plaintiff's gallbladder.

On October 30, 2003, Kathleen King, Ph.D., completed a Mental Residual Functional Capacity Assessment (Tr. at 301-303). She found that "with treatment compliance and abstinence from drug abuse and alcohol," plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures
- The ability to understand and remember very short and simple instructions

---

[21]Gallstones in the gallbladder or bile duct resulting in cramping pain the right upper abdomen.

27

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

She found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to interact appropriately with the general public

- The ability to respond appropriately to changes in the work setting

- The ability to set realistic goals or make plans independently of others

In support of her findings, Dr. King noted that after plaintiff's March and April 2003 hospital stays, he was stable with euthymic mood at discharge with abstinence and treatment compliance. Several primary care physicians advised plaintiff to stop drinking. He fell on September 13, 2003, after drinking. Plaintiff's "symptoms appear exacerbated by alcohol. Medical record indicates improvement with abstinence and treatment compliance. Under those conditions claimant appears able to perform at least low stress, low skill tasks. With continuing alcohol abuse he probably could not perform even less demanding tasks."

In a Psychiatric Review Technique completed on the same day, Dr. King found that plaintiff suffered from mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace (Tr. at 305-318). Again, she qualified this by adding "with treatment compliance and abstinence from drug abuse and alcohol."

Plaintiff was a patient at Liberty Hospital from November 5, 2003, through November 26, 2003 (Tr. at 394-449). He presented at the emergency room with nausea and vomiting. "He has been

29

treated on numerous occasions for alcohol hepatitis/cirrhosis and the patient continues to drink." Plaintiff had a cholecystectomy (removal of the gallbladder) and live biopsy on November 6, 2003. "The patient's course has been complicated by alcohol withdrawal postoperatively. The patient was in the hospital in September with nausea, vomiting, ascities, and alcoholic hepatitis. He was admitting at that point to drinking a fifth of whiskey a day and has continued to do so per his wife. He had been told numerous times that continued alcohol use would ultimately result in death but despite this he continued to drink." Plaintiff's liver biopsy showed cirrhosis. He was assessed with:

1.    Alcoholic cirrhosis with complications of ascites, hypertension, hypoalbuminemia, coagulopathy and thrombocytopenia.

2.    Active alcohol abuse with alcoholic hepatitis.

3.    Elevated liver function tests presumed secondary to alcoholic hepatitis and cirrhosis.

"Unfortunately in a patient with advanced liver disease this situation does have a poor prognosis and this was discussed with the patient's wife in detail." On November 21, 2003, he had an esophagogastroduodenoscopy[22].

---

[22]Esophagogastroduodenoscopy (EGD) is an examination of the lining of the esophagus, stomach, and upper duodenum with a small camera (flexible endoscope) which is inserted down the throat. This procedure is also called an upper endoscopy.

On December 2, 2003, five days after plaintiff was discharged from the hospital, he saw Dr. Vinton for a follow up of cirrhosis (Tr. at 263, 503). "He has not drank alcohol since about November 5th (prior to his last hospitalization). He has been taking a multivitamin but not the thiamine which he was on previously. He is sleeping well at night. . . . His wife reports that his short-term memory is not good. . . . His appetite is not good. . . . There is no obvious ascites. . . . There is mild diffuse weakness in all four extremities."

Dr. Vinton's impression was cirrhosis, secondary to alcohol consumption; weakness probable due to many factors including loss of muscle mass due to alcohol consumption and poor nutrition as well as deconditioning; depression, stable; and hypertension resolved with the weight loss and cessation of alcohol consumption. Dr. Vinton wrote, "I strongly recommended continued alcohol abstinence."

On December 4, 2003, plaintiff saw Dr. Beggs for a follow up on his gallbladder removal (Tr. at 453). Plaintiff said he had abstained from alcohol since his discharge from the hospital. Dr. Beggs removed the drainage bag and staples.

On December 11, 2003, plaintiff saw Dr. Beggs for a follow up (Tr. at 453). "His appetite seems to be picking up a little bit although the patient does admit to drinking alcohol since he

31

was last seen in the office.  He was again warned about serious implications of continuing to drink."

On December 18, 2003, plaintiff saw Dr. Beggs for a follow up (Tr. at 452).  Dr. Beggs drained fluid from plaintiff's surgical wound and prescribed another course of antibiotics.

On December 19, 2003, plaintiff saw Dr. Vinton for a follow up (Tr. at 502).  "He has not drank alcohol now since about November 5th.  He is still weak, but he and his wife feel as if his strength is improving.  His appetite is getting better."

On December 29, 2003, plaintiff saw Dr. Vinton for a follow up (Tr. at 501).  "He has been treated for depression with Celexa 20 mg daily. . . .  It has been quite effective in controlling his depression."  Plaintiff had some ascites although less.  He had some ankle edema, but less than his last appointment with Dr. Vinton.  Dr. Vinton assessed depression in remission.

On December 30, 2003, plaintiff saw Dr. Beggs for a follow up (Tr. at 452).  Dr. Beggs drained more fluid from plaintiff's surgical wound and noted that plaintiff appeared to be somewhat improved.

On January 6, 2004, plaintiff saw Dr. Vinton for a follow up of cirrhosis (Tr. at 500).  "His wife continues to notice that he is very sleepy and occasionally confused.  He denies vomiting, cough, or fever."  On exam, Dr. Vinton noted significant ascites.

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 32 of 86

He assessed cirrhosis, secondary to alcoholic liver disease and worsening jaundice.  He ordered blood work and referred plaintiff to gastroenterologist Tom Jones for further advice on management of his chronic liver disease.

On January 6, 2004, Dr. Jones made a note on plaintiff's lab report that says, "You are showing some increase in liver inflammation.  Not sure why." (Tr. at 505, 899).

On January 14, 2004, plaintiff saw Dale Wytock, M.D., a gastroenterologist (Tr. at 460).  "He was recently in the hospital . . . and had an open cholecystectomy [removal of the gallbladder] and had possible spontaneous bacterial peritonitis following that.  He had a persistent fluid leak which eventually stopped.  He has had problems with abdominal pain resulting in use of narcotic pain medication which has exacerbated his encephalopathy[23].  He has been abstinent from alcohol since November."  This is inconsistent with plaintiff's admission to Dr. Beggs on December 11, 2003, that he had indeed used alcohol since his release from the hospital in November.

---

[23]Encephalopathy is a condition characterized by altered brain function and structure.  Encephalopathy may be caused by advanced and severe disease states, infections, or as a result of taking certain medications. The three main causes of encephalopathy are liver disease, kidney disease, and lack of oxygen in the brain. The associated symptoms can include subtle personality changes, inability to concentrate, lethargy, progressive loss of memory and thinking abilities, progressive loss of consciousness, and abnormal involuntary movements.

33

Dr. Wytock assessed end stage alcoholic liver disease with ascities and encephalopathy. "Will defer to Dr. Vinton whether this gentleman is a candidate for liver transplant. If he is abstinent for three to six months from alcohol, he may be a transplant candidate from his liver standpoint if he does not have any serious underlying medical problems."

On January 16, 2004, plaintiff underwent a paracentesis (Tr. at 557). Five liters of fluid were removed.

On January 22, 2004, plaintiff saw Thomas Jones, M.D., a gastroenterologist (Tr. at 454A-455[24]). "According to his wife, the patient has not been taking his lactulose[25] or neomycin[26] as scheduled. He unfortunately is continuing to take narcotic pain medicine as well." Dr. Jones was told that plaintiff had abstained from alcohol since his release from the hospital in November, although this is inconsistent with plaintiff's admission to Dr. Beggs on December 11, 2003, that he had used alcohol since his hospital release in November. Dr. Jones discussed the possibility of seeking an opinion from the liver

---

[24]The first page of this record has a handwritten page number of 444A. Because it appears between pages 454 and 455, I assume it was mistakenly numbered 444A instead of 454A.

[25]Treats chronic constipation.

[26]An antibiotic used to reduce the risk of infection during surgery of the bowel. Neomycin is also used to reduce the symptoms of hepatic coma.

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 34 of 86

transplant center at the University of Kansas, but plaintiff's wife said she was "not ready at this time. . . . Certainly again it was discussed for several times now there should be no alcohol and he is evidently compliant with this since his last hospitalization. I am fearful this gentleman's mortality rate is urgently 100% within the next year and possibly 6 months."

On January 27, 2004, plaintiff underwent a paracentesis (Tr. at 552). Five liters of fluid were removed. He also saw Dr. Jones (Tr. at 570-571). "He is still not drinking alcohol. . . . His short term memory is extremely poor." Dr. Jones wrote, "At this point, he is improving with outpatient management. I did, while the patient and his wife were in the clinic, discussed the case with KU hepatologist, Dr. Hussein, who at this point was fairly adamant in saying that he is not a liver transplant candidate without 6 months of documented AA or alcohol counseling. . . . At this point, we are rather stuck in regards to treatment options. . . . Both the patient and his wife have been told frankly that this disease is terminal unless a liver transplant is given in the future and he remains off the alcohol. I feel that his life expectancy is probably less than a year if he does not rebound. We will try our best to keep him comfortable, but very limited options at this point."

35

On March 23, 2004, plaintiff completed a patient questionnaire for Leon Probasco, a therapist (Tr. at 474). He was asked whether, during the past month, (1) he had had an anxiety attack (to which he answered "no"), (2) he had thought he should cut down on his drinking of alcohol (to which he answered "yes"), (3) anyone had complained about his drinking (to which he answered "yes"), and if there was ever a single day in which he had consumed five or more drinks of beer, wine or liquor (to which he answered "yes"). On that same day, plaintiff's wife completed a Proactive EAP form (Tr. at 475-477). She was asked how many times during the past month plaintiff had used alcohol, prescription or recreational drugs to excess, and she reported "none." The records indicate that plaintiff saw Leon Probasco, a Clinical Social Worker, six times from March 23, 2004, through September 14, 2004 (Tr. at 478).

On April 14, 2004, plaintiff saw Gail Bissell, RN (Tr. at 569). Plaintiff reported continuing to drink three to four cans of alcohol every night. "His mental status has been fairly good, according to his wife." On exam, Ms. Bissell found no erythema, edema, or crepitus of the joints; full range of motion of all extremities; and a steady gait. Plaintiff answered questions appropriately but had some forgetfulness of detailed answers.

36

On April 21, 2004, plaintiff underwent a paracentesis (Tr. at 543). During the procedure, 6700 ml of fluid were removed.

On April 30, 2004, plaintiff saw Dr. Vinton for a following up on his end stage liver disease, secondary to alcohol (Tr. at 489). "His appetite remains poor. Unfortunately, he has recently begun drinking some alcohol again, and is now drinking three or four beers daily."

On June 2, 2004, plaintiff underwent a paracentesis (Tr. at 533). During the procedure, 5700 ml of fluid were removed. Plaintiff also saw Gail Bissell, RN (Tr. at 565). "His wife is accompanying him today. She states that he has had some rare disorientation. . . . He does drink four to five beers a day." Ms. Bissell advised plaintiff to stop drinking and told him he would not be a liver transplant candidate without six months of documented AA or alcohol counseling.

On June 17, 2004, plaintiff saw Dr. Jones (Tr. at 563). Since his last paracentesis, plaintiff was staying relatively stable from a fluid standpoint. "Unfortunately, he does not take his lactulose as prescribed. . . . He has attended 1 or 2 psychiatric counseling sessions in regards to depression and alcohol abuse, but did not keep his other appointments, per his wife." Dr. Jones encouraged plaintiff again to consider psychiatric counseling and AA. "At this point he is not an OLT

37

[orthotopic liver transplant] candidate because of his continued refractoriness to following these suggestions per Dr. Hussein at KU Medical Center. I have discussed with his wife that he is absolutely not to be behind the wheel of a car, that he may put himself as well as others in danger".

On July 30, 2004, plaintiff saw Gail Bissell, RN (Tr. at 562). Plaintiff was complaining of increasing fluid on his abdomen with shortness of breath. "He continues to drink alcohol. He states the last time he drank some beer was two weeks ago. He had been advised to join AA on several occasions." Ms. Bissell observed that plaintiff had a steady gait and answered questions appropriately. "I did instruct him to avoid alcohol again."

On August 2, 2004, plaintiff underwent a paracentesis (Tr. at 524). During the procedure, 5,350 ml of fluid were removed.

On August 16, 2004, Dr. Vinton wrote a letter to whom it may concern (Tr. at 510). The letter reads as follows:

I am a board certified family physician, and have cared for Johnny Lee Overman since 1986. I continue to provide care to him. He has end stage liver failure as a result of excessive alcohol consumption. He has been having gradually increasing problems since early 2002. He first started noticing some memory loss in 2002. By late 2002, his physical condition had deteriorated enough that he was having increasing difficulty working. As a result of the complications of alcoholism, he has developed memory problems, muscle weakness, recurrent nausea and vomiting, as

38

well as fatigue and lethargy related to his worsening liver
disease.  He also has had ongoing problems with depression.

As a result of the above-mentioned problems, he has been
unable to work at least since January 20, 2003. Both his
physical and mental health problems have precluded him from
any sort of full-time work since that time.

In summary, I consider Johnny Lee Overman to be disabled due
to his health problems.  His mental status does not allow
the concentration to do any sort of complex mental work.  He
has extreme muscle weakness, largely as a result of previous
excessive alcohol use.  He also has end stage liver disease,
which causes fatigue, lethargy, and cognitive slowing.

On that same day, Dr. Vinton completed a Residual Functional

Capacity Assessment (Tr. at 511-514).  He found that plaintiff

could lift less than ten pounds, could sit for one hour at a time

and for two hours total during the day, could stand or walk for

less than one hour at a time and less than one hour total, and

would need to lie down three hours per day.  Dr. Vinton found

that plaintiff could not use his hands for grasping or fine

manipulation, could not use his hand or arms for repetitive

motion or pushing or pulling arm controls, could not use his legs

for pushing or pulling foot controls, and would not be able to

perform a job requiring bilateral manual dexterity.  He found

that plaintiff could never squat, crouch, or climb; that he could

occasionally bend, stoop, crawl, or kneel; and that he could

frequently reach and maintain balance.  He found that plaintiff's

limitation against unprotected heights is severe, his limitation

against being around moving machinery is severe, his limitation

39

against driving is severe, his limitation against exposure to temperature and humidity changes is moderate, and he had no limitation against exposure to dust or fumes. He noted that plaintiff suffers from dizziness, lethargy, poor coordination, and lack of alertness. He wrote that plaintiff suffers from depression, irritability, short attention span, and memory problems. He found that plaintiff's ability to deal with the stress of a low stress job was "poor to none." He found that plaintiff's impairment would cause him to miss work three or more times per month, that he did not need an assistive device to ambulate. When asked to give the date at which plaintiff had been functioning at this level, Dr. Vinton wrote "early January, 2003". Finally, when asked to list the clinical and laboratory findings supporting the limitation, Dr. Vinton wrote, "(1) marked elevation of liver enzymes, (2) diffuse muscle weakness, (3) cognitive slowing, (4) marked abdominal distention, due to ascites."

On August 24, 2004, Dr. Jones noted that plaintiff was "attending an alcohol rehab program as well as psychiatric counseling." Plaintiff was not watching the salt in his diet and was eating pickles on a regular basis. Dr. Jones recommended that plaintiff be set up for an orthotopic liver transplant evaluation (Tr. at 251).

40

On September 18, 2004, plaintiff was admitted to Liberty Hospital for a ruptured umbilical hernia and ascites (Tr. at 578-580). "Most of the history is obtained from the patient's wife. He is kind of confused at this time. . . . He has not been drinking much over the last five months and only had maybe a couple of drinks over the last four to five months." Syed Khalid, M.D., noted that plaintiff "is already under consideration for possible liver transplant if he continues to be sober. . . . In the meantime he will be on fluid restriction of about 2 liters a day and will continue diuretics of Aldactone 200 mg twice a day and Lasix 40 mg three times a day. He will be on a low salt diet."

During plaintiff's hospital stay, he was seen by Sofia Khan, M.D. Dr. Khan was told that plaintiff quit drinking alcohol in November of 2003 (Tr. at 587). Also during this hospital stay, Brad Hoffman, D.O., was told that plaintiff has an extensive alcohol abuse history "which continues" (Tr. at 590).

On September 23, 2004, Hussain Haideri, M.D., performed a consultative exam while plaintiff was still a patient at Liberty Hospital (Tr. at 581-584). "The increasing ascites caused a rupture of the umbilical hernia which he has had for the last few months. That results in leaking of ascitic fluid. . . . He has not been drinking alcohol for a while except for here and there

whenever he could get his hands on it. . . . However, his wife does admit that he drinks tons of fluid at home. In fact she admitted that he drinks whatever he can get his hands on. Consequently his oral fluid intake may be in excess of four to five liters a day at times."

Dr. Haideri restricted plaintiff's fluid intake to 1,200 ml a day maximum. "He should concentrate on getting nutritional assessments to enhance his protein intake which could only be maintained if he continues to be alcohol free."

Plaintiff was a patient at Liberty Hospital from October 9, 2004, until his discharge on October 13, 2004 (Tr. at 614-615). He was admitted "after he was noncompliant with his fluid restriction and he drank alcohol at home and his swelling increased. Within a short period of time the wife brought him to the Emergency Room where he was noted to be extremely swollen. . . . [He had] an interventional radiologist drain about four liters of fluid from his abdomen." While at the hospital, plaintiff saw Dr. Haideri (Tr. at 617-621). Dr. Haideri noted that plaintiff had a "history of significant alcohol abuse, which unfortunately still persists. He admits to drinking alcohol even up til his present admission. He was hospitalized towards the end of September with abdominal distention, ascites and a rupture of umbilical hernia. This was repaired. . . . He improved and

42

was discharged home with clear instructions for fluid restriction, salt restriction and abstinence from alcohol. Unfortunately he admits that he has been noncompliant in all those areas." Plaintiff also said he was not sure whether he had been taking his medications as directed.

Plaintiff was able to answer questions appropriately, had no evidence of headaches or mental status changes except for being somewhat groggy from his pain medications. He was oriented to time, place, and person. His speech was somewhat slurred indicating some degree of "medication/alcohol influence." Dr. Haideri cautioned plaintiff about continued alcohol use, fluid restriction, and salt use. "Overall prognosis is very poor if noncompliance remains a factor."

Plaintiff saw Syed Khalid, M.D., while hospitalized (Tr. at 622-624). "He had about six drinks in one day and had alcohol off and on and according to the wife was not very compliant with a low-sodium diet and fluid restriction. . . . Most of the history was obtained from the patient's wife."

On October 14, 2004, Leon Probasco, Licensed Clinical Social Worker, completed a Mental Residual Functional Capacity Assessment (Tr. at 648-650). He found that plaintiff was "extremely limited" in the following:

- The ability to remember locations and work-like procedures

43

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

He found that plaintiff was "markedly limited" in the following:

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to set realistic goals or make plans independently of others

In support of these findings, Mr. Probasco wrote the following:

> This patient presents with extremely limited ability to walk and displays extremely slow gait, difficulty breathing, and must use a cane or walk with assistance. Clinical interview reveals poor memory, difficulty understanding, and obsessive abuse of alcohol in spite of severe and chronic physical, medical, psychological, and family negative consequences. The patient exhibits severe and recurrent symptoms of depression with anxiety as measured by the Beck Depressive Inventory and Burns Anxiety Inventory and Pfizer Patient Inventory. The [illegible] alcohol test confirms chronic alcohol dependence. Clinical interview and history [illegible] the patient needs a liver transplant but has been unable to qualify due to his continued periodic abuse of alcohol in spite of medical and psychological recommendations.

The form asks whether, if the patient were to stop consuming all alcoholic beverages, would the patient be as impaired as shown above, and Mr. Probasco checked, "yes" (Tr. at 650).

On October 15, 2004, Leon Probasco, Licensed Clinical Social Worker, wrote a letter to plaintiff's attorneys in connection with his disability claim (Tr. at 646-647). The letter reads in part as follows:

> Mr. Overman was seen in my office for outpatient evaluation, psychotherapy, and alcohol counseling on six dates beginning

45

3-23-04, and ending 9-14-04.  He and his spouse participated in these therapy sessions.

<u>Work Ability</u>:  This patient is clearly fully disabled from any type of work.  This patient presents with chronic and severe symptoms of alcoholism and recurrent symptoms of severe depression.  The patient has numerous physical and mental limitations that prevent him from being able to work. The patient walks slowly with the use of a cane and presents with numerous physical symptoms including severe stomach pain, chest pain, dizziness, shortness of breath, and is medically awaiting a liver transplant with a prerequisite of having at least six months abstinence from any alcohol use. With regard to the severe symptoms of depression, this patient would be unable to focus or conduct any work responsibilities due to his depressed mood, loss of interest, anxiety, and irritability.  Given the requirements of most jobs, this patient would be unable to perform in a competitive or stressful situation.

Dates of Disability:  Mr. Overman and his wife, Janice Overman, informed me during their initial visit on 03-25-05[27] that Mr. Overman has been unable to work since 01-20-03. . . .

On October 24, 2004, plaintiff was again admitted to Liberty Hospital due to increased swelling (Tr. at 662-665, 669-671, 848-850).  Plaintiff was treated by Sofia Khan, M.D., who wrote, "This is one of his multiple admissions for increased swelling. His most recent admission was a few weeks ago when he was admitted with hyponatremia[28] and increased swelling.  At that time he had had some alcohol prior to admission."  He was seen by

---

[27]Plaintiff saw Mr. Probasco on March 25, 2004, not March 25, 2005.  This is clearly a typographical error.

[28]Hyponatremia occurs when there is an abnormally low amount of sodium in the blood or when there is an excess of water in the blood plasma.

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 46 of 86

Raghavendra Adiga, M.D., on October 29, 2004. "Unfortunately he has not been able to avoid alcohol quite yet having been known to have binge drinking as recently as a month ago. . . . [H]ence he is not yet being considered a candidate for liver transplant. Apparently he has also been noncompliant with treatment including not following fluid restrictions, etc."

While hospitalized, plaintiff saw his gastroenterologist, Dr. Jones, who wrote, "He has been noncompliant with instructions in regards to avoidance of alcohol. Despite being in rehabilitation, counseling and a 12 step program he has had binge drinking as recently as September of this year. The patient's wife is concerned about his noncompliance with diet as well, although she states everything she cooks for him has been very low sodium. He has been on a fluid restriction but he is up at night. It is uncertain at this point whether he is drinking lots of fluids. In the hospital during prior admissions he has been caught drinking fluid out of the water tap, despite being on restrictions." Dr. Jones noted that "[a]t this point the patient is not an orthotopic liver transplantation candidate because of continued alcohol binges and abuse."

On November 29, 2004, plaintiff saw Gail Bissell, RN (Tr. at 832). "He has been alert. No confusion. His wife states that he did drink 3/4 of a fifth of alcohol that he found in the

47

trash.  He also has been eating some salty foods, which seems to worsen his edema."  Ms. Bissell told plaintiff to continue the salt restriction and avoid alcohol.

On December 18, 2004, plaintiff was again admitted to Liberty Hospital with confusion and lethargy (Tr. at 696-698, 843-845).  The evening before he had diarrhea while walking up the stairs (Tr. at 702-704).  "He had recently been on pain medication including Tylenol and codeine for knee pain.  He was taken off that medication.  He was given oxycodone as needed sparingly.  His medications were continued from home.  He was found to have a low blood pressure on the morning of the 19th. His Aldactone [diuretic] was decreased from 100 mg twice a day to 25 mg twice a day.  He tolerated this well.  On the day of discharge he was up walking in his room and was feeling stronger."  He was discharged with no restrictions on physical activity (Tr. at 697).

Plaintiff was a patient at Liberty Hospital from January 3, 2005, through January 9, 2005 (Tr. at 766-767, 840-842).  He was admitted due to increasing knee pain.  Plaintiff was "alert, ambulatory, in no acute distress."  Dr. Kahn noted that plaintiff "still continues to occasionally drink alcohol." (Tr. at 768-770, 711-773, 774-776).  He admitted that over the past several days, he had not closely been following the medical

recommendation regarding fluid with salt restriction and came to the Emergency Room because of an increased abdominal girth. According to Yan Chen, M.D., "[m]ost likely the cause of the worsening ascites is noncompliance with medical therapy." (Tr. at 775). When he was discharged, he had no restrictions on physical activity (Tr. at 767, 773).

On January 16, 2005, plaintiff was again admitted to Liberty Hospital due to a sudden onset of severe low back pain (Tr. at 787-790, 836-839). He was in the hospital for 11 days. He told Timothy Monahan, M.D., that he had the "atraumatic relatively sudden onset" of back pain with difficulty bending over (Tr. at 791). Dr. Monahan examined plaintiff, including his knee, and noted that plaintiff was "getting around relatively well" (Tr. at 793). "He had no prior history of back pain. The pain was excruciating. It could not be controlled by medications given in the Emergency Room so he was admitted for further care. Upon further questioning a few days into the hospitalization he did mention, which he did not tell us initially, was that he had fallen off the stairs and injured his back." When plaintiff was discharged on January 27, 2005, he was fully ambulatory and in no acute distress.

49

*C.*  ***SUMMARY OF LAB WORK***

Below is a summary of plaintiff's liver function tests. Abnormal measurements are listed in bold.  An explanation of each test follows:

AST:  AST is found in the liver and other organs.  High AST levels in the bloodstream can be a sign of liver trouble, but AST levels cannot be used to forecast disease progression or specifically measure liver damage.

Alkaline Phosphatase:  Alkaline phosphatase is an enzyme found in the bones, intestines, kidneys and placenta as well as the liver.  Abnormally high ALP can have many causes other than liver damage including bone disease, congestive heart failure, and hyperthyroidism.  A rise in ALP levels can indicate liver trouble if GGT levels are also elevated.

ALT:  ALT is found in the liver only.  High levels of ALT in the bloodstream indicate possible liver inflammation and/or damage.  An ALT test cannot predict liver damage or disease progression.

Bilirubin:  Bilirubin metabolism begins with the breakdown of red blood cells. Red blood cells contain hemoglobin, which is broken down to heme and globin. Heme is converted to bilirubin, which is then carried by albumin in the blood to the liver.  In the liver, most of the bilirubin is chemically attached to

50

another molecule before it is released in the bile.  This
"conjugated" (attached) bilirubin is called direct bilirubin;
unconjugated bilirubin is called indirect bilirubin. Total serum
bilirubin equals direct bilirubin plus indirect bilirubin.
Conjugated bilirubin is released into the bile by the liver and
stored in the gallbladder, or transferred directly to the small
intestines.  If the bile ducts are blocked, direct bilirubin will
build up, escape from the liver, and end up in the blood.
Increased direct bilirubin may indicate obstructed biliary (liver
secretion) ducts, cirrhosis, hepatitis, or other conditions.

Albumin:  Albumin is the major protein present within the
blood and is synthesized by the liver.  Therefore, it represents
a major synthetic protein and is a marker for the ability of the
liver to synthesize proteins.  It  only one of many proteins that
are synthesized by the liver.  However, since it is easy to
measure, it represents a reliable and inexpensive laboratory test
for physicians to assess the degree of liver damage present.
When the liver has been chronically damaged, the albumin may be
low.  This would indicate that the synthetic function of the
liver has been markedly diminished. Such findings suggest a
diagnosis of cirrhosis.  Malnutrition can also cause low albumin
with no associated liver disease.  When albumin levels become
very low, fluid can leak out from the blood vessels into nearby

tissues, causing swelling in the feet and ankles.

Ammonia:  Analysis of blood ammonia aids in the diagnosis of severe liver diseases and helps to monitor the course of these diseases.  Ammonia levels are helpful in the diagnosis and treatment of hepatic encephalopathy, a serious brain condition caused by the accumulated toxins that result from liver disease and liver failure.

December 4, 2002

|  | Measurement | Normal Range |
|---|---|---|
| **AST** | **77** | < 45 |
| Alk Phos | 114 | 50-136 |
| **ALT** | **51** | < 45 |
| **Direct Bilirubin** | **0.7** | 0.0-0.3 |
| **Total Bilirubin** | **1.7** | 0.0-1.0 |
| Albumin | 3.5 | 3.4-5.0 |

(Tr. at 378).

March 28, 2003

|  | Measurement | Normal Range |
|---|---|---|
| **AST** | **106** | <45 |
| Alk Phos | 124 | 50-136 |
| ALT | 34 | < 45 |
| **Total Bilirubin** | **2.0** | 0.0-1.0 |

(Tr. at 241).

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 52 of 86

September 1, 2003

|                   | Measurement | Normal Range |
|-------------------|-------------|--------------|
| **AST**           | **93**      | < 45         |
| **Alk Phos**      | **237**     | 50-136       |
| ALT               | 39          | < 45         |
| **Direct Bilirubin** | **3.2**  | 0.0-0.3      |
| **Total Bilirubin**  | **4.4**  | 0.0-1.0      |
| **Albumin**       | **2.7**     | 3.4-5.0      |
| **Ammonia**       | **35**      | 11-32        |

(Tr. at 286).

September 8, 2003

|                   | Measurement | Normal Range |
|-------------------|-------------|--------------|
| **AST**           | **78**      | < 45         |
| **Alk Phos**      | **197**     | 50-136       |
| **Direct Bilirubin** | **3.3**  | 0.0-0.3      |
| **Total Bilirubin**  | **6.9**  | 0.0.1.0      |
| **Albumin**       | **2.6**     | 3.4-5.0      |
| **Ammonia**       | **95.6**    | 11-32        |

(Tr. at 269).

September 16, 2003

|                   | Measurement | Normal Range |
|-------------------|-------------|--------------|
| **AST**           | **101**     | < 45         |
| **Alk Phos**      | **248**     | 50-136       |
| **ALT**           | **71**      | < 45         |
| **Direct Bilirubin** | **2.2**  | 0.0-0.3      |
| **Total Bilirubin**  | **2.4**  | 0.0-1.0      |
| **Albumin**       | **2.3**     | 3.4-5.0      |
| **Ammonia**       | **48**      | 11-32        |

(Tr. at 334).

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 53 of 86

November 5, 2003

|                  | Measurement | Normal Range |
|------------------|-------------|--------------|
| AST              | 69          | < 45         |
| Alk Phos         | 219         | 50-136       |
| ALT              | 54          | < 45         |
| Direct Bilirubin | 2.1         | 0.0-0.3      |
| Total Bilirubin  | 2.7         | 0.0-1.0      |
| Albumin          | 1.6         | 3.4-5.0      |
| Ammonia          | 70          | 11-32        |

(Tr. at 404).

November 8, 2003

|                  | Measurement | Normal Range |
|------------------|-------------|--------------|
| AST              | 101         | < 45         |
| Alk Phos         | 149         | 50-136       |
| ALT              | 56          | < 45         |
| Direct Bilirubin | 2.9         | 0.0-0.3      |
| Total Bilirubin  | 3.8         | 0.0-1.0      |
| Albumin          | 1.9         | 3.4-5.0      |

(Tr. at 447).

November 12, 2003

|                  | Measurement | Normal Range |
|------------------|-------------|--------------|
| AST              | 69          | < 45         |
| Alk Phos         | 219         | 50-136       |
| ALT              | 54          | < 45         |
| Direct Bilirubin | 2.1         | 0.0-0.3      |
| Total Bilirubin  | 2.7         | 0.0-1.0      |
| Albumin          | 1.6         | 3.4-5.0      |
| Ammonia          | 70          | 11-32        |

(Tr. at 448-449).

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 54 of 86

<u>December 2, 2003</u>

|  | Measurement | Normal Range |
|---|---|---|
| AST | 42 | < 45 |
| **Alk Phos** | **188** | 50-137 |
| ALT | 22 | < 45 |
| **Total Bilirubin** | **3.5** | 0.0-1.0 |
| **Albumin** | **2.3** | 3.4-5.0 |

(Tr. at 509).

<u>January 6, 2004</u>

|  | Measurement | Normal Range |
|---|---|---|
| **AST** | **598** | < 45 |
| **Alk Phos** | **262** | 50-136 |
| **ALT** | **355** | < 45 |
| **Direct Bilirubin** | **3.4** | 0.0-0.3 |
| **Total Bilirubin** | **6.2** | 0.0-1.0 |
| **Albumin** | **2.3** | 3.5-5.0 |

(Tr. at 504, 898).

<u>January 27, 2004</u>

|  | Measurement | Normal Range |
|---|---|---|
| **AST** | **123** | < 45 |
| Alk Phos | 244 | 50-136 |
| **ALT** | **107** | < 45 |
| **Direct Bilirubin** | **3.5** | 0.0-0.3 |
| **Total Bilirubin** | **5.0** | 0.0-1.0 |
| Albumin | 1.8 | 3.5-5.0 |
| **Ammonia** | **59** | 11-32 |

(Tr. at 549).

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 55 of 86

<u>June 8, 2004</u>

|                  | Measurement | Normal Range |
|------------------|-------------|--------------|
| **AST**          | **53**      | < 45         |
| Alk Phos         | 93          | 50-136       |
| ALT              | 20          | < 45         |
| **Direct Bilirubin** | **1.1** | 0.0-0.3      |
| **Total Bilirubin**  | **2.7** | 0.0-1.0      |
| **Albumin**      | **2.8**     | 3.5-5.0      |
| **Ammonia**      | **108.4**   | 11-32        |

(Tr. at 566).

<u>August 24, 2004</u>

|                  | Measurement | Normal Range |
|------------------|-------------|--------------|
| AST              | 38          | < 45         |
| Alk Phos         | 124         | 50-136       |
| ALT              | 30          | < 45         |
| **Direct Bilirubin** | **1.0** | 0.0-0.3      |
| **Total Bilirubin**  | **2.2** | 0.0-1.0      |
| **Albumin**      | **2.7**     | 3.5-5.0      |

(Tr. at 517).

<u>January 2, 2005</u>

|                  | Measurement | Normal Range |
|------------------|-------------|--------------|
| **AST**          | **83**      | < 45         |
| **Alk Phos**     | **141**     | 50-136       |
| ALT              | 44          | < 45         |
| **Direct Bilirubin** | **0.7** | 0.0-0.3      |
| **Total Bilirubin**  | **1.4** | 0.0-1.0      |
| **Albumin**      | **2.9**     | 3.5-5.0      |
| **Ammonia**      | **71**      | 11-32        |

(Tr. at 730).

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 56 of 86

*D.   SUMMARY OF TESTIMONY*

During the August 1, 2005, hearing, Selbert Chernoff, M.D., testified as a medical expert; and Amy Silva testified as a vocational expert.  As this was after plaintiff had passed away, his widow, Janice Overman, testified at the hearing on his behalf.

**1.   Plaintiff's widow's testimony.**

Plaintiff Johnny Overman died on March 27, 2005, at the age of 58 (Tr. at 37).  When he died, plaintiff was 5' 6" tall and weighed about 150 to 160 pounds (Tr. at 37).  Plaintiff and Mrs. Overman had been married for 35 years (Tr. at 38).

Plaintiff had a bachelors degree in Social Studies and had a teaching degree (Tr. at 38).  Plaintiff worked in sales for 30 years (Tr. at 38).

Plaintiff filed an application for disability benefits on September 29, 2003, alleging on onset of disability of August 31, 2003 (Tr. at 38).  When the denial letter was issued, it referred to an onset date of April 15, 2003 (Tr. at 39).  When a request for hearing was filed, the alleged onset date was January 20, 2003 (Tr. at 39).  When Mrs. Overman was asked about these discrepancies in the alleged onset dates, she said:

> I can just tell you it's been a horrible two years. . . .
> Actually, longer than that.  And as we kind of talked
> through this, we had to kind of come to terms with when he
> could not work anymore.  And that January date is kind of

57

main date when he began to be ill all the time. He had
worked for two companies. Both of them went bankrupt. One
in -- He had worked for two snack food companies, that both
had gone bankrupt. One was in 2001. That was Dyce Foods in
Liberty. And this other one was 2003, and that was his kind
of stopping date with that. . . . [Dyce Foods] was sold to
a person who took it over and ran it in the ground.

(Tr. at 40-41).

Mrs. Overman was asked why she believed plaintiff was

disabled in January 2003 as opposed to August 2003 (Tr. at 42).

She said:

That's when the real problem started, the vomiting, the
anxiety. He officed in our home. He couldn't even use the
phone anymore, I just kind of became the secretary. So we
tried to hold it together, maybe try to do some things to
help him. But in March and April, he tried suicide
attempts, one in one month, one in the next. And we tried
treatment centers. We could not save him. But that January
date --

(Tr. at 42).

Mrs. Overman testified that plaintiff's drinking was caused

by depression (Tr. at 42). He began treatment for anxiety and

depression in 2001 (Tr. at 42). Plaintiff's drinking problem

began in 2003, although he had always been a beer drinker (Tr. at

42). Plaintiff was a social drinker but his drinking became

worse in 2003 (Tr. at 43).

The ALJ noted that plaintiff had good earnings in 2002, but

no earnings in 2003 (Tr. at 43). He asked plaintiff's widow to

explain that (Tr. at 43). She said:

58

> Jay's Foods, who he worked for out of Chicago, pulled out of
> the Kansas City area, quit paying him. My son was a
> distributor for them. . . . They just quit bringing product
> to the area. And they, later, went bankrupt as well. But
> Kansas City was an area that Johnny was trying to bring
> their product to the area. To do that, my younger son was
> hired to run a distributorship for Jay's Foods, so the
> product came through him. And everything was cut off as of
> January.

(Tr. at 43).

Mrs. Overman testified that the company left the Kansas City

area in January 2003 (Tr. at 43-44). The ALJ asked how plaintiff

would have gotten along working had he not lost his job due to

the company leaving the area (Tr. at 44). Mrs. Overman said:

> He wouldn't have been able to get another job. He was
> already too anxious and too depressed. And it's hard to
> explain that, but here's a man that grew up poor, graduated
> from college, was very proud of his work, you know, working,
> he worked for Frito Lay for 12 years for Borden when he
> first moved to the area. . . . And the 2001 Dyce Foods job
> just about did him in. He was one of the last people left.
> He had to fire people on an ongoing basis. That was his job
> to narrow the workforce when they were kind of heading
> toward bankruptcy. And then that was a very difficult time
> for him. And then in 2003, after working for Jay's Foods
> for, I guess, about a year and a half, he was with Jay's
> Foods, they too, had financial problems, small regional
> snack food companies just have a hard time making, I guess,
> you'd say.

(Tr. at 44).

Mrs. Overman worked as plaintiff's secretary beginning in

2001 (Tr. at 45-46). "[W]hen he went to work for Jay's Foods,

there was no money to hire a full staff. He'd always worked, you

know, in an office with secretaries, but this was a new venture

59

to the Kansas City area.  So they hired Johnny at a certain salary.  He was expected to do the whole job and find a distributor, or distributors if it had branched out enough." (Tr. at 45-46).  Plaintiff worked like this from June 2001 until January 2003 (Tr. at 46).  When Jay's Foods pulled out of Kansas City, plaintiff had no business (Tr. at 46).

In January 2003, plaintiff was suffering from severe anxiety, severe depression, daily vomiting, and shaking (Tr. at 46).  He began taking medication for anxiety in 2001 (Tr. at 47). He had a panic attack once in 2001 while he was on a plane to Dallas for an interview, and everyone thought he was having a heart attack (Tr. at 47).

When plaintiff lost his job in January 2003, he was not mentally together enough to find another job (Tr. at 47).  He had already succumbed to depression and anxiety to the point where Mrs. Overman had to dial the phone for him at times because his hands were shaking (Tr. at 47).

In March 2003 plaintiff tried to cut his wrists (Tr. at 48). The family took him to Shawnee Mission Medical Center and checked him into a program for depression and alcoholism (Tr. at 48). Plaintiff worked with a psychiatrist there, but within a few weeks he tried to commit suicide again (Tr. at 48).  Plaintiff had cut himself and he went to Liberty Hospital in an ambulance

60

and had the cut sewn up (Tr. at 48).  From Liberty Hospital,

plaintiff went to Two Rivers under a three-day lock up (Tr. at

48-49).  This occurred in April 2003 (Tr. at 49).

## 2.   **Medical expert testimony.**

Selbert Chernoff, M.D., is a physician board-certified in

internal medicine (Tr. at 29).  Dr. Chernoff testified that had

plaintiff's liver disease not been caused by alcohol, the

severity of his liver disease would have met listing 5.05 "very

early in this record" (Tr. at 31).

> [T]he issue, of course, is when did the alcohol abuse become
> no longer material, that is, when was his liver disease so
> bad that even quitting would not make him better?  And
> that's a hard one to answer, of course, because he didn't
> quit, never did quit, couldn't quit, obviously could not.
> He had been told 27 times that the booze was killing him,
> and he just was so addicted, he simply could not quit.  And
> that's how it was. But, so any effort to determine a date is
> going to be slightly better than necromancy, but not, it
> can't be absolute.  It cannot be.

(Tr. at 31).

Plaintiff had an EGD done on December 3, 2002 (Tr. at 32).

During an EGD, the physician looks into the patient's esophagus

and stomach (Tr. at 32).  There were no liver function studies

done in April 2003 when plaintiff was seen in the emergency room

(Tr. at 33).  "I don't see them, and I don't believe they're in

the record, so I don't think you can establish that he had

cirrhosis, severe cirrhosis at that point.  What did happen was

alcohol intoxication with a reactive depression caused by his

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 61 of 86

alcohol abuse. He got canned because he'd been drinking, of course." (Tr. at 34). Dr. Chernoff testified that the earliest onset of disability would have been January 2004 when his doctors thought he was not going to get better no matter what he did, and that an onset of disability prior to January 2004 was "generous" (Tr. at 35).

Dr. Chernoff testified that some people would not be conscious with a blood alcohol level of 300, and most doctors think a blood alcohol level of 500 is lethal (Tr. at 35). Plaintiff's blood alcohol level was 326 when he went to the emergency room on April 13, 2003 (Tr. at 35). The legal limit for intoxication in the state is 80, which means his blood alcohol level was four times the legal limit (Tr. at 35). Despite the high level of alcohol, there is no way to say whether there was liver disease present without liver function tests which were not done (Tr. at 36).

### 3. Vocational expert testimony.

Vocational expert Amy Salva testified at the request of the Administrative Law Judge. The vocational expert testified that plaintiff's past relevant work is in "manager, sales" and is classified as sedentary highly skilled work in the Dictionary of Occupational Titles (Tr. at 50). However, as performed, the job was in the light range (Tr. at 50).

62

The first hypothetical involved a person with alcohol-induced liver disease with complaints of anxiety and depression who could lift up to 20 pounds occasionally and three to five pounds "without great frequency" (Tr. at 50). The vocational expert testified that such a person could perform plaintiff's past relevant work.

The ALJ then said that the person's anxiety and depression would have impeded his concentration, persistence and pace to a moderate degree (Tr. at 51). The vocational expert testified that he would not have been employable if he was unable to concentrate a third of the day (Tr. at 51).

The ALJ changed that to mildly restricted concentration, persistence, and pace (Tr. at 51). The vocational expert testified that the person could have performed plaintiff's job duties if the difficulty with concentration occurred less than one-third of the day (Tr. at 51).

The ALJ added the fact that the person would be likely to miss about four days of work per month (Tr. at 51). The vocational expert testified, "I think he would have had difficulty maintaining employment over a long term, missing four days per month. As a member of management, he probably had greater vacation time that he could have used as some of those days, but four days a month is a little excessive." (Tr. at 51).

63

Plaintiff's attorney asked the following hypothetical: assume a person with the impairments listed in the Mental Residual Functional Capacity assessment of plaintiff's therapist, Leon Probasco, dated October 14, 2004 (summarized in the medical section above) (Tr. at 52). The vocational expert testified that such a person would be unemployable (Tr. at 53).

The attorney then asked if a person having the limitations listed in the Residual Functional Capacity Assessment of Thomas Vinton, M.D., dated August 16, 2004, could work (Tr. at 53). The vocational expert testified that a person with those limitations could not work (Tr. at 53).

**4.    Pauline Yarbrough**

Pauline Yarbrough, plaintiff's mother-in-law, completed a Daily Activities Questionnaire on June 16, 2004 (Tr. at 210-213). She reported that she saw plaintiff three times per year. She reported that plaintiff wakes a lot during the night, takes short naps, needs help with bathing and dressing. She reported that he needs help to get ready for a doctor's appointment and to get in the car. When asked how plaintiff's social activities had changed since his condition began, Ms. Yarbrough wrote, "It has changed from being a very effective worker and golfer beginning in January 2003 when he lost his job and became very depressed."

64

## 5.  Ranie Overman

Ranie Overman, plaintiff's daughter-in-law, completed a
Daily Activities Questionnaire on July 21, 2004 (Tr. at 214-217).
She reported that she saw plaintiff on a daily basis and was
temporarily residing with plaintiff to assist him.  She reported
that plaintiff sleeps off and on during the day and that his
sleep is restless during the night.  Pain prevents a full night's
rest.  When asked how plaintiff's social activities changed since
his condition began, Ms. Overman wrote, "His job loss triggered
severe clinical depression."

## 6.  Janice Overman

On June 25, 2004, plaintiff's wife, Janice Overman,
completed a Daily Activities Questionnaire (Tr. at 218-221).  The
form asks how plaintiff's social activities changed since his
condition began.  Mrs. Overman wrote, "Johnny was a busy sales
manager who enjoyed being with friends & colleagues.  After his
job loss, depression took all of this away."

## V.  FINDINGS OF THE ALJ

Administrative Law Judge Jack Reed entered his opinion on
August 23, 2005 (Tr. at 20-26).

Step one.  Plaintiff did not engage in substantial gainful
activity after his alleged onset date (Tr. at 22).

Step two.  Plaintiff suffered from chronic liver disease, alcohol-inducted cirrhosis, and alcoholism, impairments that were severe (Tr. at 22).  The ALJ found that there is no evidence plaintiff was severely limited by depression or any other mental or emotional impairments; therefore, the ALJ found that plaintiff did not have a severe mental impairment (Tr. at 22).  "The evidence also demonstrates that claimant's main disabling impairment was alcohol abuse, which precipitated and aggravated symptoms and limitations from depression and anxiety and caused the worsening of his liver condition." (Tr. at 22).

Step three.  Plaintiff's impairments did not meet or equal a listed impairment (Tr. at 22).

Step four.  Absent the effects of alcoholism, plaintiff retained the residual functional capacity to lift up to 50 pounds occasionally and at least ten pounds frequently, he could sit six hours per day and stand or walk two hours per day, he could handle or grasp objects, and he had no significant limitations due to mental or emotional impairments (Tr. at 24).  With this residual functional capacity, plaintiff was able to perform his past relevant work as a national sales representative and distributor coordinator for a snack food company as this job was performed by plaintiff (Tr. at 25).

66

Therefore, plaintiff was found not disabled prior to August 1, 2003, at the fourth step of the sequential analysis.

## VI. *OPINIONS OF TREATING MEDICAL PROFESSIONALS*

Plaintiff first argues that the ALJ erred in ignoring the opinions of Leon Probasco, plaintiff's therapist, and Thomas Vinton, M.D., plaintiff's treating physician.

## A. *THOMAS VINTON, M.D.*

The relevant opinion is the August 16, 2004, letter to whom it may concern (Tr. at 510) and the Residual Functional Capacity Assessment (Tr. at 511-514) completed the same day. The letter reads as follows:

> I am a board certified family physician, and have cared for Johnny Lee Overman since 1986. I continue to provide care to him. He has end stage liver failure as a result of excessive alcohol consumption. He has been having gradually increasing problems since early 2002. He first started noticing some memory loss in 2002. By late 2002, his physical condition had deteriorated enough that he was having increasing difficulty working. As a result of the complications of alcoholism, he has developed memory problems, muscle weakness, recurrent nausea and vomiting, as well as fatigue and lethargy related to his worsening liver disease. He also has had ongoing problems with depression.
>
> As a result of the above-mentioned problems, he has been unable to work at least since January 20, 2003. Both his physical and mental health problems have precluded him from any sort of full-time work since that time.
>
> In summary, I consider Johnny Lee Overman to be disabled due to his health problems. His mental status does not allow the concentration to do any sort of complex mental work. He has extreme muscle weakness, largely as a result of previous excessive alcohol use. He also has end stage liver disease, which causes fatigue, lethargy, and cognitive slowing.

67

In the Residual Functional Capacity Assessment, Dr. Vinton found that plaintiff could lift less than ten pounds, could sit for one hour at a time and for two hours total during the day, could stand or walk for less than one hour at a time and less than one hour total, and would need to lie down three hours per day. Dr. Vinton found that plaintiff could not use his hands for grasping or fine manipulation, could not use his hand or arms for repetitive motion or pushing or pulling arm controls, could not use his legs for pushing or pulling foot controls, and would not be able to perform a job requiring bilateral manual dexterity. He found that plaintiff could never squat, crouch, or climb; that he could occasionally bend, stoop, crawl, or kneel; and that he could frequently reach and maintain balance. He found that plaintiff's limitation against unprotected heights is severe, his limitation against being around moving machinery is severe, his limitation against driving is severe, his limitation against exposure to temperature and humidity changes is moderate, and he had no limitation against exposure to dust or fumes. He noted that plaintiff suffers from dizziness, lethargy, poor coordination, and lack of alertness. He wrote that plaintiff suffers from depression, irritability, short attention span, and memory problems. He found that plaintiff's ability to deal with the stress of a low stress job was "poor to none." He found that

68

plaintiff's impairment would cause him to miss work three or more times per month, that he did not need an assistive device to ambulate. When asked to give the date at which plaintiff had been functioning at this level, Dr. Vinton wrote "early January, 2003". Finally, when asked to list the clinical and laboratory findings supporting the limitation, Dr. Vinton wrote, "(1) marked elevation of liver enzymes, (2) diffuse muscle weakness, (3) cognitive slowing, (4) marked abdominal distention, due to ascites."

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a

69

whole, and (6) specialization of the doctor.  20 C.F.R. §
404.1527(d)(2) – (5).

In this case, I do not think there is any question that
plaintiff actually suffered from the limitations described by Dr.
Vinton.  The question is whether the record supports Dr. Vinton's
opinion that these limitations occurred from January 2003 through
August 2003.

The first fact I want to point out is that there are no
medical records from December 9, 2002, through March 28, 2003.
Therefore, Dr. Vinton did not even see plaintiff during the first
few months of this period, and the last time Dr. Vinton had seen
plaintiff before March 28, 2003, was while plaintiff was still
working full time.

Next, I point out that plaintiff saw Dr. Vinton on only one
occasion from January 1, 2003, through the date he was found
disabled.  That was on March 28, 2003.  During that visit, Dr.
Vinton found that plaintiff had "some persistent elevation of
liver enzymes, although not severely high."  That was at a time
when plaintiff was "drinking about 1/2 to 3/4 of a pint of hard
liquor daily."  With regard to plaintiff's mental impairment, Dr.
Vinton diagnosed "depression, secondary to alcoholism".  This
means depression caused by alcoholism.

70

Because Dr. Vinton had no other contact with plaintiff during the relevant time, I find that the ALJ's decision to discount the opinion of Dr. Vinton as it applied to the time period January 2003 through September 2003 is supported by the record.

In addition, I find that Dr. Vinton's opinion with respect to this time period is inconsistent with the findings of other doctors whom plaintiff did see in 2003. In late March 2003, Dr. Young observed that plaintiff's gait was normal. This is inconsistent with Dr. Vinton's finding that plaintiff suffered from "extreme muscle weakness". Dr. Young found that plaintiff's mood, affect, speech, orientation, memory, thought processes, and thought content were all normal. This is inconsistent with Dr. Vinton's finding that plaintiff suffered from memory loss.

Furthermore, Dr. Vinton's own records suggest that the expressed limitations do not date back as far as Dr. Vinton's letter indicates. On September 8, 2003, Dr. Vinton wrote, "If he stops drinking, there is a chance he may have some recovery." In December 2003, he found only mild weakness in plaintiff's extremities. This is inconsistent with his finding in the letter and RFC assessment that plaintiff suffered from "extreme muscle weakness" in early 2003. He also noted in December 2003 that plaintiff's depression was stable. In April 2004, Dr. Vinton

71

noted that plaintiff had a steady gait, and during that same month plaintiff's wife told Dr. Vinton that plaintiff had "some rare disorientation."

Dr. Vinton relied in part on "marked elevation of liver enzymes"; however, a review of the liver function tests shows that plaintiff's liver enzymes did not become markedly abnormal until January 2004, despite his very heavy drinking during 2003.

Finally, his opinion is inconsistent with the opinion of Dr. Chernoff who found that plaintiff's condition did not really worsen to the point of disability until January 2004 when his doctors concluded he would not get better even if he stopped drinking. As mentioned above, Dr. Vinton believed during the fall of 2003 that plaintiff had a chance of recovery if he abstained from alcohol.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinion of Dr. Vinton in his August 16, 2004, letter and Residual Functional Capacity Assessment.

**B.  *LEON PROBASCO***

Plaintiff argues that the ALJ erred in ignoring the letter "to whom it may concern" on October 15, 2004 (Tr. at 646-647) which reads in relevant part as follows:

> Mr. Overman was seen in my office for outpatient evaluation, psychotherapy, and alcohol counseling on six dates beginning

72

3-23-04, and ending 9-14-04.  He and his spouse participated in these therapy sessions.

<u>Work Ability</u>:  This patient is clearly fully disabled from any type of work.  This patient presents with chronic and severe symptoms of alcoholism and recurrent symptoms of severe depression.  The patient has numerous physical and mental limitations that prevent him from being able to work.  The patient walks slowly with the use of a cane and presents with numerous physical symptoms including severe stomach pain, chest pain, dizziness, shortness of breath, and is medically awaiting a liver transplant with a prerequisite of having at least six months abstinence from any alcohol use.  With regard to the severe symptoms of depression, this patient would be unable to focus or conduct any work responsibilities due to his depressed mood, loss of interest, anxiety, and irritability.  Given the requirements of most jobs, this patient would be unable to perform in a competitive or stressful situation.

Dates of Disability:  Mr. Overman and his wife, Janice Overman, informed me during their initial visit on 03-25-04 that Mr. Overman has been unable to work since 01-20-03. . . .

On August 9, 2006, the Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed.Reg. 45,593 (Aug. 9, 2006).  The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources."

SSA separates information sources into two main groups: "acceptable medical sources" and "other sources."  It then divides "other sources" into two groups:  medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists.

73

20 C.F.R. § § 404.1513(a), 416.913(a) (2007).  According to

Social Security regulations, there are three major distinctions

between acceptable medical sources and the others:

1.  Only acceptable medical sources can provide evidence to
    establish the existence of a medically determinable
    impairment.  <u>Id</u>.

2.  Only acceptable medical sources can provide medical
    opinions.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)
    (2007).

3.  Only acceptable medical sources can be considered
    treating sources.  20 C.F.R. §§ 404.1527(d) and
    416.927(d) (2007).

In the category of "other sources," again, divided into two

subgroups, "medical sources" include nurse practitioners,

physician assistants, licensed clinical social workers,

naturopaths, chiropractors, audiologists, and therapists. "Non-

medical sources" include school teachers and counselors, public

and private social welfare agency personnel, rehabilitation

counselors, spouses, parents and other caregivers, siblings,

other relatives, friends, neighbors, clergy, and employers. 20

C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the

existence of a medically determinable impairment," according to

SSR 06-3p.  <u>Sloan v. Astrue</u>, 499 F.3d 883, 888 (8th Cir. 2007).

"Instead, there must be evidence from an 'acceptable medical

source' for this purpose.  However, information from such 'other

sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. quoting SSR 06-3p.

SSR 06-3p is a clarification of existing SSA policies. The SSA explained its reasons for issuing the ruling:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

The ruling directs the SSA's adjudicators to give weight to opinions from medical sources who are not "acceptable medical sources":

> Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions. . . .

> [D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the

75

individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

In general, according to the ruling, the factors for considering opinion evidence include:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

SSR 06-3p; 71 FR 45593-03.

Therefore, it is clear that Mr. Probasco is not an acceptable medical source who can provide evidence of an impairment. His opinion is relevant only as to the severity of plaintiff's impairment and how it affected plaintiff's ability to function.

The relevant time period in this case spans from January 2003 through August 2003. Mr. Probasco did not begin seeing plaintiff until March 23, 2004 -- more than a year after the alleged onset of disability. He saw plaintiff a total of six times over a six-month period. His letter states that his

opinion, as it applies to 2003, is based solely on the statements of plaintiff and his wife.

Mr. Probasco is qualified to provide evidence only as to plaintiff's mental impairment.  During the relevant time period, Dr. Vinton found that plaintiff's depression was caused by his alcoholism.  Plaintiff spent a couple of days at Shawnee Mission Medical Center.  When he was discharged (after having abstained from alcohol for a few days), his mood, affect, speech, orientation, memory, thought processes, and thought content were all normal.  His mood was much better, his affect was bright, calm, and euthymic.  He described his mood as an eight out of ten on the day of discharge.

Plaintiff relapsed and was in the hospital again the following month after consuming large quantities of alcohol. Again, after detoxification, plaintiff's mood was "really good", his affect was bright, calm, and euthymic.

Therefore, Mr. Probasco's opinion with respect to the relevant portion of 2003 is inconsistent with the other medical evidence.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to ignore the letter written by plaintiff's therapist, Leon Probasco.

77

***VII. CREDIBILITY OF THIRD PARTIES***

Plaintiff next argues that the ALJ erred in failing to address the evidence offered by the third parties.

The courts have consistently criticized the Social Security Administration for failing to discuss third-party statements:

> Where proof of a disability depends substantially upon subjective evidence . . . a credibility determination is a critical factor in the Secretary's decision. Thus, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1255 (11th Cir. 1983). <u>See</u> <u>also</u> <u>Andrews v. Schweiker</u>, 680 F.2d 559, 561 (8th Cir. 1982). In this case, the administrative law judge was, of course, free to disbelieve the testimony of Basinger, his wife, and the affidavits of others. <u>Isom v. Schweiker</u>, 711 F.2d 88, 89-90 (8th Cir. 1983); <u>Simonson v. Schweiker</u>, 699 F.2d 426, 429 (8th Cir. 1983). This, however, the administrative law judge did not do. Rather, the administrative law judge denied disability benefits based on the lack of objective medical evidence.

<u>Basinger v. Heckler</u>, 725 F.2d 1166, 1170 (8th Cir. 1984).

However, the fact that the courts have made this criticism on a regular basis does not mean that in every case the failure of an ALJ to analyze the credibility of third-party witnesses remand is automatic. For example, in <u>Young v. Apfel</u>, 221 F.3d 1065 (8th Cir. 2000), the court held that the ALJ "implicitly" evaluated the testimony of the claimant and her witnesses by evaluating the inconsistencies between her statements and the medical evidence.

> [B]ecause the same evidence also supports discounting the testimony of Young's husband, the ALJ's failure to give

specific reasons for disregarding his testimony is inconsequential.  See Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995) (arguable failure of ALJ specifically to discredit witness has no bearing on outcome when witness's testimony is discredited by same evidence that proves claimant's testimony not credible).  Finally, we find that the ALJ did not discredit the statements of Young's friends merely on the grounds that they were not medical evidence; rather, the ALJ observed that the statements were devoid of specific information that could contradict the medical evidence regarding Young's capabilities during the relevant time period.

Id. at 1068-1069.

See also Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Bates v. Chater, 54 F.3d 529, 533 (8th Cir. 1995).

In this case, plaintiff's mother-in-law, Pauline Yarbrough, wrote that plaintiff wakes a lot during the night and needs help with bathing and dressing.  However, she also reported that she saw plaintiff about three times per year.  She completed the form on June 16, 2004 -- about a year and a half after the alleged onset date -- and did not give any indication in the form (1) how she would know these things given her almost non-existent contact with plaintiff, or (2) that any of the information in the form applied to 2003.  The implication that this testimony is irrelevant is so clear as to amount to a specific credibility finding.

Plaintiff's daughter-in-law completed a form on July 21, 2004, reporting that plaintiff's sleep is restless during the night, that his pain prevents a full night's sleep, and that he

sleeps off and on during the day.  Again, there is nothing in the
form that says how Mrs. Overman would know about plaintiff's
night time sleeping activities.  Although she indicated she
temporarily moved in with plaintiff and his wife to help out, it
does not follow that she would be present in the same room with
plaintiff during the night while he was trying to sleep.  In
addition, she does not state what time period she lived with her
in-laws.  According to plaintiff's administrative paperwork, he
actually worked until March 2003, although he was not paid for
the work he did that year.  There is no indication that plaintiff
was having any difficulty getting around during the relevant time
period in 2003[29] which makes it unlikely that his son and
daughter-in-law moved in during that time to help out.  In any
event, because Ranie Overman failed to indicate in this document
that she had any basis for providing an opinion as to plaintiff's
condition in 2003, and because the other evidence in the record
makes it appear implausible that she was living with plaintiff
during 2003, the implication that this testimony is irrelevant is
so clear as to amount to a specific credibility finding.

---

[29]In fact, the record makes pretty clear that plaintiff was
able to get around just fine, as he was consuming a fifth of
whiskey a day during most of that time.  Because the record
indicates that plaintiff had the support of his family who were
all attempting to get him to stop drinking, I can only assume
that plaintiff was able to go out and buy that alcohol, as it
seems implausible that his family would be providing him with it.

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 80 of 86

Finally, plaintiff's wife completed a Daily Activities Questionnaire on June 25, 2004, and also testified at the hearing. Mrs. Overman testified that plaintiff changed his alleged onset date to January 20, 2003, because that was "kind of [the] main date when he began to be ill all the time. . . . That's when the real problem starting, the vomiting, the anxiety." She said plaintiff was suffering from daily vomiting and severe depression. This testimony is not consistent with the other evidence in the record, including evidence that was prepared by plaintiff and his wife.

In a Disability Report completed with the assistance of Mrs. Overton on September 17, 2003, plaintiff reported that he was first unable to work due to his condition on April 1, 2003. In a Work Activity Report dated September 17, 2003, plaintiff reported that he continued to work through March 2003, even though he was not being paid (to the tune of over $10,000 in unpaid services). At that time, he began collecting unemployment benefits. In the same Disability Report, plaintiff reported that he stopped working because Jays Snack Foods pulled out of the Kansas City market, not because of any impairment. None of this information reported in the administrative documents is consistent with Mrs. Overman's testimony in August 2005 that plaintiff was suffering from severe depression and daily vomiting beginning in January

81

2003.

Furthermore, the medical records establish that plaintiff's vomiting (which was not daily) was routinely precipitating by consuming alcohol.  Plaintiff reported vomiting on September 30, 2002, and on December 3, 2002, but he was still employed during those times.  On December 9, 2002, he reported that he had not had alcohol since before his hospitalization on December 3, 2002, and he denied any nausea or vomiting.  The next complaint of vomiting came almost 3 1/2 months later on March 28, 2003, following binge drinking.  After a couple days in the hospital going through detox, the nausea and vomiting ceased.  The next complaint of vomiting came on July 23, 2003, after consuming alcohol.  There are no other complaints of vomiting from January 2003 until after plaintiff's benefits began.

The medical records also establish that plaintiff was not treated for depression during the relevant time period.  He was seen multiple times for the effects of consuming massive quantities of alcohol.  However, even plaintiff told his doctors that had he not been drinking, he never would have cut himself. His mood was fine after detoxification each time he was hospitalized.

Finally, I note that plaintiff's wife was either not truthful with plaintiff's doctors on some occasions or was

82

unaware of the extent of her husband's behavior.  Either
circumstance would justify the ALJ's discrediting her testimony.
For example, on March 31, 2004, plaintiff told Leon Probasco that
during the past month he had thought he should cut down on his
alcohol consumption, others had complained about his drinking,
and there were occasions when he had consumed five or more drinks
of alcohol per day.  On that same day, plaintiff's wife completed
an EAP form and reported that plaintiff had not used alcohol to
excess on any day during the previous month.

On November 29, 2004, plaintiff's wife told Gail Bissell,
RN, that plaintiff drank "3/4 of a fifth of alcohol that he found
in the trash."  It makes little sense that a family member as
supportive as plaintiff's family have been described would set a
bottle of alcohol in the trash rather than pouring it down a
drain.  The medical records show that plaintiff was drinking
alcohol regularly during 2003, and this suggests that plaintiff
was able to get into a car and drive somewhere to purchase
alcohol regularly, as the records are very consistent that his
family members were supportive and would not likely be supplying
him with alcohol.  This suggests that plaintiff's limitations
were not nearly as bad during the relevant time as plaintiff's
wife testified.

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 83 of 86

For all of the above reasons, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinions of plaintiff's relatives.

## VIII. OTHER OBSERVATIONS

Plaintiff claimed in his administrative paperwork that he did more than $10,000 worth of work during 2003 for which he was not paid, and that he lost his job in March 2003 when he began receiving unemployment benefits. He collected unemployment benefits through September 2003, and his disability benefits were retroactive to August 1, 2003. The acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability. See Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998); Salts v. Sullivan, 958 F.2d 840, 846 n. 8 (8th Cir. 1992). Furthermore, plaintiff's working though not receiving his salary due to the financial problems of the company do not support a claim for disability benefits. See generally United States v. Somsamouth, 352 F.3d 1271, 1275-76 (9th Cir. 2003) ("[P]eople commonly speak about working around the house, although they receive no monetary compensation for that. And one might do work for a charity or a friend, which achieves great objectives, but which generates no income whatsoever for the worker."), cert. denied, 541 U.S. 1000 (2004).

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 84 of 86

Finally, I point out that plaintiff was advised every time he saw a doctor or a nurse during the relevant time period to stop drinking. He was also advised to participate in alcohol addiction treatment in the form of inpatient or outpatient treatment or Alcoholics Anonymous. Plaintiff failed to abide by the treatment recommendations of his doctors. When an impairment can be controlled by treatment or medication,[30] it cannot be considered disabling. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff was not disabled prior to August 1, 2003. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

---

[30]It is clear from a review of the medical records that plaintiff's symptoms could be controlled by abstaining from alcohol, as his liver enzymes improved after each hospital stay (when he was not consuming alcohol), and his symptoms of confusion, nausea, vomiting, and depression subsided after abstaining from alcohol.

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 85 of 86

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 8, 2008

Case 4:07-cv-00130-REL   Document 13   Filed 09/08/08   Page 86 of 86